

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JOSHUA D. WALLS                                          PLAINTIFF

versus                          Civil Action No. 1:16cv176 LG-RHW

OMEGA PROTEIN, INC.                                      DEFENDANT

# COMPLAINT

### (Jury Trial Demanded)

COMES NOW Joshua D. Walls, Plaintiff, and files this Complaint against the Defendant,

Omega Protein, Inc.  In support thereof Plaintiff would show unto the Court the following facts

and matters, to wit:

### Parties

1.      Plaintiff, Joshua D. Walls ("Plaintiff" or "Walls"), is an adult resident citizen of

Jackson County, Mississippi, residing at 3800 Braddock Avenue, Moss Point, Mississippi 39562.

2.      Defendant Omega Protein, Inc. ("Omega") is a foreign corporation organized and

existing under the laws of the state of Virginia and which has its principal place of business in

either the state of Texas or the state of Louisiana.  Omega is admitted to do business in the state

of Mississippi.  Omega's registered agent for service of process is C.T. Corporation System, 645

Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

### Jurisdiction

3.      This Court has original jurisdiction of this action pursuant to the provisions of 28

USCA § 1332 in that complete diversity of citizenship exists between all plaintiffs and all

defendants, and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars

($75,000.00), exclusive of interest and costs.

4.      This court has *in personam* jurisdiction over the Defendant by virtue of the facts that Defendant is admitted to do business in the state of Mississippi and committed a tort, in whole or part, within the state of Mississippi.

## Venue

5.      This Court has venue of this action pursuant to the provisions of 28 USCA § 1391 in that a substantial part of the events, acts or omissions giving rise to the instant claim occurred or accrued within the Southern Division of the Southern District of Mississippi.

## Underlying Facts

### A.      The Flammable Gases in Stickwater Tank #10

6.      At all times pertinent hereto, Omega manufactured fish meal and fish oil, and for such purpose, owned and operated a fish processing plant in Moss Point, Mississippi. Omega's plant, which consists of a tank farm and other equipment, has the capacity to cook and process up to 1800 tons of fish per day.  "Stickwater", a viscous liquid slurry of water, chemicals, and the organic remnants of cooked fish (fish solubles), is a byproduct of Omega's manufacturing process.

7.      Omega captured and stored stickwater in a steel tank known as Tank #10.  Tank #10, one of several large tanks in the tank farm, was approximately 32 feet high by 40 feet in diameter with a liquid storage capacity of 300,789 gallons.  Tank #10 was capped by a metal top weighing approximately 19,600 lbs.

8.      At all pertinent times hereto, Omega knew that the bacterial decomposition of organic matter, such as the fish solubles contained in stickwater, produced hazardous and

-2-

flammable gases. The production of flammable gases such as hydrogen sulfide, methane and methanethiol (a mercaptan gas) by decomposition of the organic matter in stickwater is a known scientific fact in the fish processing industry.

9. Hydrogen sulfide is a colorless and highly flammable gas which is heavier than air and collects in enclosed or poorly ventilated areas. Although it carriers the odor of "rotten eggs", hydrogen sulfide causes olfactory fatigue and quickly overcomes the human sense of smell, resulting in the false impression that the gas is no longer present.

10. Hydrogen sulfide is produced in nature primarily through the decomposition (*i.e.*, rotting) of proteins or organic material. A 1983 OSHA publication warned of the potential for exposure of "fishing and fish-processing workers" to hydrogen sulfide. "Toxic gases in the meat industry include ... hydrogen sulfide, which can build up in blood tanks, stickwater storage or holding tanks from rendering plants ..." *OHS Reference Guide to Australian Meat Industry.* "Fish quality may deteriorate under the anaerobic conditions found in onboard storage on fishing vessels and in the raw material silos of fish processing facilities. This deterioration causes the formation of odorous compounds such as .... mercaptans, and hydrogen sulfide gas." *2007 Environmental Health and Safety Guidelines for Fish Processing.* As recognized by a U.S. District Court in 1976:

> It is commonly known by chemists and biologists and by students taking these courses in college and by many laymen that deterioration of protein products and organic matter commonly produces hydrogen sulphide gas and that such gas in sufficient concentration is highly lethal. When fish scales and fish solubles in salt water are allowed to rot for several days in the hot sun in mid August, it should be a matter of common knowledge that such condition would probably produce hydrogen sulphide gas in dangerous concentrations if the water and solids are contained in an enclosed space.

*Consolidated Machines, Inc. v., Protein Products Corporation*, 428 F.Supp. 209, 218 (M.D. Fla.

1976).

11.     Methane is a colorless, odorless and flammable gas that occurs abundantly in nature as the result of anaerobic bacterial decomposition under water.  Anaerobic bacteria acting on fish wastes, such as those found in stickwater, produce methane.

12.     Methanethiol (methyl mercaptan) is a colorless and extremely flammable gas which is heavier than air.  Gas/air mixtures of methanethiol are explosive.  Like hydrogen sulfide, methanethiol is produced by the anaerobic decomposition of organic raw material in the silos of fish processing facilities.  *2007 Environmental Health and Safety Guidelines for Fish Processing.*

### B.     Omega's Failure to Warn of the Dangers of Tank #10

13.     Hydrogen sulfide, methane, and methanethiol gases, produced by the decomposition of stickwater within Tank #10, are easily ignited by hot work activities such as cutting, welding or grinding.  Despite that fact, Tank #10 was not marked with a clear and adequate warning.  Rather, Tank #10 bore a standard industry safety placard which contained possible warnings, in a "multiple choice" type format, for Omega's selection.

14.     In selecting the safety placard warnings for Tank #10, Omega mislabeled Tank #10 and failed to warn of the dangers of its contents.  As marked by Omega, the safety placard placed on Tank #10 indicated that Tank #10's contents were "normally stable, even under fire exposure conditions", that the risk of flammability of its contents was low, and that exposure to its contents would not cause serious injury.  Although the safety placard should have been marked to select other available warnings thereon for Tank #10 – such as "heat may detonate", "violent chemical change", and "unstable if heated" – Omega failed to mark the safety placard so

as to select such warnings and thereby failed to adequately warn of Tank #10's dangers, including the flammability of its contents.

### C.   New Construction involving Tank #10

15.     In early 2014 Omega planned construction of an additional stickwater holding tank to be designated as Tank #4. Tank #4's design specifications called for it to be the same approximate size and capacity as Tank #10 and to be built adjacent to Tank #10. Plans for the new tank also called for construction of a catwalk which would stretch across the top of Tank #10 and extend to the top of Tank #4. The estimated completion date for all work was June 1, 2014.

16.     Omega contracted with Accu-Fab & Construction, Inc. ("Accu-Fab") for fabrication and erection of Tank #4 and the catwalk from Tank #10 to Tank #4. In turn, Accu-Fab contracted with a staffing agency, Global Employment Service, Inc. ("Global"), for the skilled labor and manpower necessary for performance of its contract with Omega.

17.     The new construction at Omega did not proceed in a timely fashion, causing delay in Omega's timetable for completion of Tank #4 and the catwalk. Omega's frustration with the delay caused it to deviate from the original order in which the construction was planned and advance the date for performance of certain construction tasks. Such an instance occurred on the morning of July 28, 2014, when Omega abruptly accelerated the date for catwalk work on Tank #10 and instructed Accu-Fab to cut piping off of the top of Tank #10 in order to make way for installation of the catwalk. As of July 28, 2014, Omega had not warned Accu-Fab or Global about, and Accu-Fab and Global had no knowledge of, the flammable gases contained inside Tank #10.

### D.      Omega's Misrepresentation of the Dangers of Tank #10

18.      Pursuant to the work procedures in place at Omega, if Accu-Fab desired that a work area be "sniffed" for the presence of flammable gas then Accu-Fab made that request to Omega.  Omega personnel would then conduct a test for flammable gas with a combustible gas detector and "clear" the area, thereby authorizing Accu-Fab to proceed with hot work.  This procedure is evidenced by the fact that it was actually followed, at least with respect to Tank #4. On the morning of July 28, 2014, at Accu-Fab's request, Omega used a combustible gas detector to sniff the interior of Tank #4, clearing it's interior for work by Accu-Fab personnel.

19.      Alan Stewart, an engineer employed by Omega, was in charge of supervising Accu-Fab's work on Omega's premises.  When Omega abruptly instructed Accu-Fab to work on Tank #10 on July 28, 2014, Joey Norman of Accu-Fab asked Alan Stewart to "clear" Tank #10 for hot work.  On information and belief, Stewart, acting on behalf of Omega, refused to use a combustible gas detector to test Tank #10 for flammable gases and failed to otherwise eliminate the flammable gases inside of Tank #10.  Instead, Stewart represented to Norman that Tank #10 was safe and ready for hot work, telling Norman that Tank #10 contained stickwater which was neither hazardous nor flammable.  In addition, Stewart added that it would cost Omega several thousand dollars to drain the stickwater out of Tank #10.  In reliance on the representations of Stewart, acting on behalf of Omega, Accu-Fab instructed its workers from Global to proceed with hot work on Tank #10.

20.      Further, prior to July 28, 2014, Stewart directed Accu-Fab workers to cut into the stickwater piping connected to Tank #10 with a welding torch.  Stewart did not warn the Accu-Fab workers of any danger, or require a combustible gas test of the stickwater, before or during

-6-

the hot work performed on the stickwater piping. In reliance on the prior representations, actions and/or omissions of Stewart relating to the safety of performing hot work on or near Tank #10, Accu-Fab instructed its workers to proceed with hot work on or near Tank #10 on July 28, 2014.

### E. The Occurrence causing personal injuries to Joshua D. Walls

21. Walls, hired by Global for work with Accu-Fab, reported to work at Accu-Fab's business premises in Moss Point, Mississippi on the morning of July 28, 2014. Shortly thereafter, Walls and his co-worker Jerry Lee Taylor II ("Taylor") were dispatched to Omega. Upon arrival at Omega, the Accu-Fab foreman, Rusty Gables, directed Walls and Taylor to cut the piping off of the top of Tank #10. Gables told Walls and Taylor that Tank #10 was "good to go", which meant in welder parlance that Tank #10 was cleared for hot work.

22. As Walls and Taylor climbed the stairs to the top of Tank #10, they noticed two other Accu-Fab workers at ground level who were performing hot work at the base of Tank #10. The fact that hot work was already underway on Tank #10 further confirmed to Walls and Taylor that Tank #10 was cleared for hot work.

23. While Walls and Taylor were positioned on top of Tank #10, the ground-level hot work which was heating Tank #10 and its contents, ignited the hydrogen sulfide, methane and/or methanethiol gases contained inside Tank #10, resulting in an explosion of such magnitude that it blew the almost 20,000 lb. top off of Tank #10. Because the force of the explosion traveled from the bottom of Tank #10's interior toward its top – as evidenced by the upward force which blew off its top – ignition of the gases contained inside the bottom interior of Tank #10 most likely initiated the explosion. In the alternative, even though unlikely, the explosion was initiated by the hot work being performed at the top of Tank #10. In either event, the explosion would not

-7-

have occurred, and no harm would have been caused, but for Omega's negligence.

24.     The force of the explosion shot Walls' body some 100 feet to the southwest of Tank #10, where he impacted and tore through the corrugated metal roofing of an adjacent building. Walls' body landed and came to rest on a second story catwalk which was directly beneath the point where his body tore through the roof. This fortuitous circumstance likely saved Walls' life by preventing him from falling farther to the ground below. Yet, the explosion and/or impact traumas which Walls sustained caused him to suffer numerous severe personal injuries, many of which are permanent in nature.

25.     Taylor, Walls' co-worker on top of Tank #10 when it exploded, was not so lucky. The explosion catapulted Taylor's body to the southeast, where he died after landing on the metal top of another tank.

F.     **The Post-Explosion Investigation**

26.     Tank #10 was drained on July 30, 2014, resulting in the recovery of approximately eight (8) inches of stickwater. Samples of the remaining stickwater were retrieved by the United States Chemical Safety Board which provided the samples to Dr. Clifford Lange at Auburn University for independent testing. Dr. Lange's analysis of the stickwater proves to a certainty that decomposition of the organic matter in the stickwater inside of Tank #10 produced significant and flammable volumes of hydrogen sulfide, methane and methanethiol.

27.     Experts retained by Omega conducted additional post-explosion testing of the stickwater and the gases found in piping downstream from Tank #10. This testing also demonstrated the presence of significant and flammable volumes of hydrogen sulfide, methane and methanethiol.

**Duties and Breaches**

28.     At all times pertinent hereto, Omega acted by and through its employees whose negligent acts and omissions are imputed to Omega under the doctrine of *respondeat superior*.

**I**

**Failure to Investigate  and/or Warn of
the Dangers and Hazards of Stickwater**

29.     At all times pertinent hereto, Omega was charged with such knowledge as the exercise of reasonable care would have disclosed, including the characteristics of the substances produced by its business operations and the dangers and hazards incident thereto.  Omega either knew of the dangers and hazards pertinent to stickwater, or was negligent in not discovering such dangers and hazards.

30.     As the owner and operator of a fish processing plant which generated stickwater as a manufacturing byproduct, Omega had a duty to reasonably investigate the dangers and hazards of stickwater and the contents of Tank #10, *via* scientific inquiry, testing or otherwise, and to give adequate warning of such dangers and hazards to its employees and others, such as Walls, who would foreseeably come into contact with Tank #10.

31.     Omega breached such duties owed to Walls and others, in that:

a.     Omega failed to conduct a reasonable investigation of the dangerous and hazardous propensities of stickwater, including but not limited to, the flammable gases contained in Tank #10;

b.     Omega failed to adequately inspect its premises to ensure that it was surrendering a reasonably safe work environment to Walls and others;

c.      Omega failed to conduct combustible gas testing for the presence of flammable gases inside Tank #10;

d.      Omega failed to remove flammable gases from Tank #10 by the use of inert gas, by filling Tank #10 with water so as to purge all flammable gases therefrom, by draining all stickwater from Tank #10, and/or by adequately ventilating Tank #10, prior to authorizing hot work thereon;

e.      Omega failed to promulgate adequate safety rules and procedures regarding stickwater, flammable gases, and/or hot work, and/or failed to ensure that such rules and procedures were enforced and followed;

f.      Omega failed to conduct a safety orientation or otherwise instruct, train and warn its employees and others, including Walls, of the dangers and hazards of stickwater;

g.      Omega failed to appropriately label Tank #10 so as to adequately warn Walls and others coming in contact therewith of the risks, dangers and hazardous propensities of its contents;

h.      Omega authorized and allowed hot work to be performed on a tank which contained an explosive atmosphere due to the presence of flammable gases generated by stickwater therein; and

i.      In other ways to be proved at trial, Omega unreasonably exposed Walls to an unreasonable risk of harm by failing to take reasonable measures to guard against foreseeable hazards about which Omega knew, or should have known, in the exercise of reasonable care.

-10-

## II

### Premises Liability

32.     Walls entered Omega's premises at its express or implied invitation for the mutual advantage of himself and Omega, and at all times pertinent hereto, was an invitee on the premises of Omega.

33.     Omega owed Walls the duty to keep its premises reasonably safe, including the duty to surrender to him a reasonably safe work environment, and when not reasonably safe, the duty to warn Walls of all hidden dangers and perils about which Omega knew, or should have known, in the exercise of reasonable care.

34.     Omega breached such duties owed to Walls, in that:

a.      By engaging in a manufacturing process which produced stickwater, including the flammable gases generated by stickwater, Omega caused and created a hazardous condition to which it exposed Walls by instructing Accu-Fab to perform hot work on, around or in proximity to Tank #10; and

b.      Omega failed to adequately warn Walls of a dangerous condition about which it knew, or should have known, in the exercise of reasonable diligence.

## III

### Negligent Misrepresentation

35.     By representing to Accu-Fab, and hence Walls, that it was safe to perform hot work on Tank #10, Omega was obligated to exercise reasonable care in making such representation.

36.     Omega, acting by and through its employees, negligently misrepresented the

-11-

dangers and hazards pertinent to Tank #10 and the stickwater therein to Accu-Fab, acting on behalf of Walls, in that:

      a.      Omega's representation that Tank #10, and its contents, were safe for hot work, was a misrepresentation and/or omission of fact which was both material and significant;

      b.      In making such misrepresentation, Omega failed to exercise that degree of diligence and expertise which members of the public, including Walls, are entitled to expect of Omega;

      c.      Accu-Fab, acting on behalf of Walls, and Walls reasonably relied upon Omega's representations concerning Tank #10 and the stickwater therein; and

      d.      Walls sustained numerous severe personal injuries, many of which are permanent in nature, as a direct and proximate result of the reliance of Accu-Fab, acting on his behalf, and his reliance on Omega's representations.

## Damages

### I

### Compensatory Damages

37.      As a direct and proximate result of the negligence of Omega, Walls sustained serious and debilitating personal injuries to his head, neck, chest, left shoulder, left upper extremity, left wrist and hand, right upper extremity, right wrist and hand, left hip, left lower extremity, right lower extremity, and the cervical, thoracic, lumbar and lumbosacral regions of his back.  Walls' injuries have necessitated comprehensive medical care and treatment, including but not limited to, seven (7) surgeries to date.  As a result of the occurrence and such injuries, Walls sustained the following compensatory damages:

a.      Reasonable and necessary medical expenses incurred to date in an amount in

excess of $604,785.01;

b.      Future medical and life care expenses in the present value amount of $780,341.00;

c.      Past and future lost wages for impairment of his earning capacity in the present

value amount of $1,106,885.00;

d.      Miscellaneous out of pocket expenses and pecuniary losses incurred for mileage

to medical care providers, medical supplies, over the counter medications, and other necessities

related to his personal injuries;

e.      Past and future pain and suffering, including physical pain and related emotional

distress, depression and anxiety;

f.      A loss of bodily function and related impairment of his right to the enjoyment of

life; and

g.      Temporary and permanent bodily disfigurement.

## II

### Punitive Damages and Attorneys Fees

38.      In the event of proof of grossly negligent, reckless or intentional conduct on the

part of or attributable to Omega, Walls is entitled to an award of punitive damages against

Omega to punish it for such conduct and to deter Omega and others similarly situated from like

conduct in the future.

39.      In the event of an award of punitive damages in this action, Walls is entitled to an

award of his reasonable attorneys fees incurred in the prosecution of this action.

-13-

## Ad Damnum

WHEREFORE PREMISES CONSIDERED, Plaintiff Joshua D. Walls now brings this action against the Defendant, Omega Protein, Inc., and demands judgment of and from Omega Protein, Inc. for all compensatory damages, punitive damages and attorneys fees alleged hereinabove, in an amount in excess of Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs, and for all costs of this action to be assessed.

## Jury Trial Demand

Plaintiff hereby demands trial by jury on all issues of fact presented in this action.

JOSHUA D. WALLS

By:

William Liston III (MSB # 8482)
william@listondeas.com
W. Lawrence Deas (MSB #100227)
lawrence@listondeas.com
LISTON & DEAS, PLLC
P.O. Box 14127
Jackson, Mississippi 39236
Tel. (601) 982-1636
Fax. (601) 982-0371

ATTORNEYS FOR PLAINTIFF